The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Liberty Mutual Insurance Company was the carrier on the risk.
4. The date of the alleged injury was December 2, 1995.
In addition, the parties stipulated into evidence the following:
1. Twelve pages of medical records and reports.
2. Packet of miscellaneous documents including Industrial Commission Forms 18 and 19, employment records and medical reports.
 ***********
In Finding of Fact No. 2 of the Deputy Commissioner's Opinion and Award, the Deputy Commissioner found that plaintiff's allegation that on December 2, 1995, she hurt her back while reaching out to thread rubber through her machine, "is not accepted as credible in view of inconsistent statements she made to people at work and to the doctors who treated her." InSanders vs. Broyhill Furniture Industries,124 N.C. App. 637, 639, 478 S.E.2d 223, 225 (1996), the North Carolina Court of Appeals ruled that the Full Commission must, prior to reversing the deputy commissioner's credibility findings on review of a cold record, "demonstrate in its opinion that it considered the applicability of the general rule which encourages deference to the hearing officer who is the best judge of credibility." We believe we have met this requirement as demonstrated below.
 ***********
The Full Commission finds facts as follows:
 FINDINGS OF FACT
1. Plaintiff was 51 years old at the time of the hearing. She made it to 11th grade in school but did not graduate. She has had no vocational training. She worked in a restaurant and in sewing and hosiery mills before coming to Fulflex in 1977. She did not have any significant health problems when she began work at Fulflex. She earned $347.60 per week, which yields a compensation rate of $231.85. Her job performance was not the subject of any problem evaluations.
2. As of December 1995, plaintiff had been working for eighteen years for Fulflex, a company that made elastic. Her job as a slitter involved operating a machine that cut rubber and put it into boxes. Threading the rubber through her machine was also part of her work duties.
3. On December 2, 1995 plaintiff hurt her back while reaching out to thread rubber through her machine. This episode constituted a specific traumatic incident of the work assigned, resulted in aggravation of a pre-existing condition, and is compensable under the Workers Compensation Act. Before the incident she felt fine. She was up on a ladder, threading a machine. There was a lot of twisting and reaching involved, as well as a lot of climbing up and down ladders. This required her to stand on her tiptoes and reach forward as far as she could across the machine. She felt a sudden pain in her low back. She told her co-worker, Dwayne Alexander, that she "must have pulled something in my back". When she came down she went to the bathroom and was holding her back. She went back up on the ladder but after about an hour she told Dwayne that she "had to go down" because her back was hurting so badly. She had not felt this kind of pain before. Dwayne Alexander corroborated plaintiff's testimony.
4. On her way out of the plant Plaintiff told her supervisor Tina that her back was "hurting real bad". She went home and took a bath and Tylenol. She got her son to help her to the bathroom and then to bed. When she woke up the next morning she could not take her usual walk and could hardly walk because of back pain. She went to the Emergency Room where she received pain pills and was taken out of work three days. She returned to work and tried to do her job but her back pain did not improve. It would be better some days then other days worse and worse. She was out through December 8 then returned December 30 to the Emergency Room. On cross examination Plaintiff admitted she was doing her regular duties at the time she got hurt. She admitted that she was supposed to report any injury to her supervisor immediately and that she should have reported to Tina Droge. She did tell Tina but it was as she was on her way out and she just kept on going. Defense witness Tina Droge corroborated this, although she said she did not write it up as an "accident" because "Betty played a lot."
5. Plaintiff had a hysterectomy in 1989. She had an episode of back pain in 1994 and spent a week in bed in the hospital with weights on her legs. She was seen up through February and March 1995 for back pain (diagnosed as degenerative disc disease). Between March and December 1995 she did not see the doctor for the back. She was operated on for pelvic lesions in August 1995; but that was unrelated to any back pain and she did not complain of back pain then.
6. Plaintiff began seeing Dr. David Miller in January 1996 for the back pain resulting from the December 2, 1995, specific traumatic incident. He tried cortisone shots but these did not resolve her pain. Physical therapy did not resolve her pain and in May Dr. Miller took her out of work pending an evaluation which led to surgery in June 1996. The operation helped her a lot but she still cannot bend like she used to and is careful not to lift heavy weights. She was having trouble walking distances. As of the date of hearing in January 1997 Plaintiff had not been released or returned to work or offered work by the company.
7. She was unclear about what exactly she told her supervisor, Eric Williams, about when she hurt her back or where. He apparently did not ask her for details of the incident when he first talked to her. She could not remember telling doctors in 1994 that she had extreme pain in her back. She was asked about disability forms and denied checking that the disability was not the result of an accident. On redirect Plaintiff identified a disability form where she had related a claim made on December 11, 1995 to an accident occurring December 2.
8. Dwayne Alexander was subpoenaed. He was working with Plaintiff when she got hurt. He had worked with her for about two years. He agreed with her description of the work. He was on the ladder next to hers when she told him her "back was hurting". He had to help her off her ladder; he had not had to help her off the ladder before. He had not heard her describe any particular back pain before this time.
9. Milton Pender was subpoenaed. He was working the same shift as Plaintiff when she got hurt. He had worked with her for about five years. He did not see the incident, but he saw her at the end of the shift that night and asked her if anything was wrong; she told him her back was hurting. She was leaning on a rail outside the door of the plant for a few minutes. He asked her if she needed help to get to her car.
10. Eric Williams is Plaintiff's department manager. He noticed she was absent on December 2 and just then Plaintiff called and said something he did not understand. He called her twice at home but she was asleep so he went by her house. Plaintiff was in bed. She could not identify to him specifically what the problem was or what caused it.
11. Morris Robinson is the plant superintendent. He discussed the injury with Williams on December 5 and then with Plaintiff. He asked her how she was doing, and then he told her "Betty, you do know that this was not reported as an accident, and therefore it would have to be filed on your regular insurance". She said she understood. He did not ask her what had happened. He was familiar with the company disability forms, one of which said it was an accident.
12. Lee Kinnon is the plant manager. He spoke to Plaintiff on several occasions. She told him she did not know where the back injury happened. She told him she did not know where it happened to get disability insurance, and he told the disability company it was not workers comp. He never tried to get the forms changed. Injured workers often accept disability medical treatment and disability compensation from disability coverage when they are unsuccessful in obtaining their company's concurrence that the incident was covered under Workers Compensation.
13. The file contains a number of medical records and documents. Plaintiff was seen at the Tarboro Women's Center in February and March 1995 complaining of pelvic pain. She had a workup with no remarks regarding back pain. She was seen again in June and August for pelvic pain again with no complaints of back pain noted. She was operated on for pelvic adhesive disease on August 16, 1995, with no mention of any back problems.
14. Plaintiff was also seen at Carolina Regional Orthopedics beginning in February 1995 for low back pain. She stated she had "progressive low back pain for last several years". X-rays showed decreased disc space at L5-S1 and she was diagnosed with degenerative disc disease at that level. She returned in March 1995 having done physical therapy and complaining of occasional pain on exertion; Dr. d'Empaire reviewed her exercises and released her prn. She returned to CRO in January 1996. According to Dr. Miller's note, she stated "the pain was insidious in onset but aggravated by her work." He diagnosed degenerative disc disease at L5-S1 and tried her on epidural cortisone. She was followed with another injection then returned in May 1996 with continuing pain. On May 29 Dr. Miller noted recurrent pain for "upwards of 7 months" and set up MRI and diskogram. She underwent a fusion at L5-S1 on July 22, 1996.
15. An emergency room note dated December 2, 1995 indicates "states hurt lower back Thursday @ work — denies any injury @ time — states pain has gradually gotten worse". She was seen again in the ER for recurrent back pain on December 30 at which time it was noted "states she raked yard yesterday" and January 10, 1996, when she complained of an on the job injury December 1 with recurrent low back pain since.
16. A company disability form dated December 11, 1995 states the claim is related to an accident occurring December 2, 1995. Company exhibits included a disability form dated February 1996 stating that the claim was related to employment, although accident was not checked.
17. A gynecologist's report dated December 14, 1995 (EF pp. 61-2) recited pertinent history of back strain requiring bed rest which was improved. Some radiating pain when back pain was acute had not recurred. The diagnosis was bacterial vaginosis and musculoskeletal pain for which metronidazole and Naprosyn were prescribed.
18. Plaintiff was also seen at Carolina Regional Orthopedics beginning in February 1995 for low back pain. She stated she had "progressive low back pain for last several years". X-rays showed decreased disc space at L5-S1 and she was diagnosed with degenerative disc disease at that level. She returned in March 1995 having done physical therapy and complaining of occasional pain on exertion; Dr. d'Empaire reviewed her exercises and released her prn. She returned to CRO in January 1996.
19. Family medical records going back to 1991 were included in the file. These include shoulder and vaginal pain, rhinitis and cystitis, respiratory infections, sinusitis, and then finally low back pain "starting about five days ago" on December 5, 1995.
20. Dr. David Miller testified by deposition. He has been engaged in orthopedic medicine since 1985 and is licensed by the State of North Carolina. He first saw Plaintiff in January 1996 complaining of back pain. Her range of motion on flexion was limited to 40 degrees from a normal value of 90. There appeared to be no pinching of the nerve root from the diagnostic tests.
21. X-rays showed disc narrowing at L5-S1 and some retrolisthesis, suggestive of disc problems. Dr. Miller was unaware of any specific injuries. He was aware she had previously been followed by Dr. d'Empaire for degenerative disc disease.
22. Dr. Miller injected Plaintiff's spine and told her to avoid heavy lifting. Plaintiff called back in May indicating continuing back pain. The condition he saw her for in May was the same he had seen her for in January. Since the injections had helped only temporarily, he recommended further diagnostic studies. These confirmed his diagnosis and ruled out other causes of back pain. A fusion operation was recommended and performed. Following the surgery Dr. Miller followed Plaintiff through a routine recovery and she did well through March 1997. He released her on April 6, 1997 with a 25 pound lifting restriction and no repetitive bending and a 15% permanent partial rating of her spine.
23. On the issue of causation, Dr. Miller testified that degenerative disc disease is "a normal process of wear and tear that occurs in all of us to a greater of lesser degree . . . it can be aggravated in some situations by other activities". Dr. Miller's medical record contained a questionnaire (not part of the stipulated records) which included the following note,
 Doing fine until 12/2/95. Was doing a lot of stretching over rolls of thread. Felt low back pain. Saturday, 12/2, she had significant pain on movement. Has been in emergency room three times for pain. Treated with Flexeril. Denies leg pain.
24. Assuming that Plaintiff had a previously diagnosed case of degenerative disc disease, had undergone medical treatment including operation for pelvic adhesive disease in August 1995 with no mention of back pain, that she presented to the ER on December 2, 1995 complaining of back pain initially when she was standing on a ladder stretching forward and felt something pop or pull, and has been having pain since then, Dr. Miller felt that her "obviously preexisting" condition in her low back was aggravated by something that occurred at work and that the incident described by Plaintiff was most likely the cause. The Full Commission finds that the incident of December 2, 1995, was a specific traumatic incident that aggravated a previous condition, resulting in compensable disability.
25. It was hard for him to say how severe the aggravation was, although the history in the preceding nine months of no complaints during her other medical visits made it more likely that the incident activated the underlying condition. The key thing the doctor would look for would be immediate reaction to pain — "the temporal point is important". The other evidence of record clearly and cogently showed immediate reaction to pain and Plaintiff's not being able to articulate the exact date to others later is not a fatal inconsistency as found by the Deputy Commissioner. Part of the problem also was the inability of her supervisors to understand what she was trying to communicate. Perhaps the best example was Tina Droge, who heard what Plaintiff told her but failed to write it up as a Workers Compensation matter because "Betty played a lot."
26. On cross examination, Dr. Miller did not have any reflection of a specific incident in his notes. Assuming that there was no specific traumatic incident Dr. Miller would agree that her need for treatment and surgery was related to her pre-existing degenerative problems.
27. The thrust of the Deputy Commissioner's findings of fact is that Plaintiff gave inconsistent stories about her back injury. Deputy Commissioner Chapman found that Plaintiff's allegation of injury on December 2, 1995 was not credible in view of inconsistent statements (Finding No. 2). She found that Plaintiff had degenerative disc disease for years and was on the safety committee and knew to report injury immediately (Finding No. 3). She found that Plaintiff did not report an injury but just that her back was hurting (Finding No. 3). She could relate her back pain to work (Finding No. 3). She described an insidious onset to Dr. Miller in January 1996 (Finding No. 3). Deputy Commissioner Chapman found that Plaintiff was seen in the emergency room December 2 and related the pain to work (Finding No. 4). She also found that she saw her gynecologist December 14 and said her radiating pain had resolved (Finding No. 4). She found that Plaintiff was seen in the ER again December 30 and advised she had been raking leaves: "Consequently, it appeared that her episode of problems in early December had improved to the point that she been able to rake leaves and then had another acute onset of back pain." (Finding No. 4). Therefore Deputy Commissioner Chapman found Plaintiff failed to prove a specific traumatic incident (Finding No. 5) and denied the claim.
28. Giving due deference to the fact that the Deputy Commissioner observed the lay witnesses, the Full Commission nevertheless disagrees with her findings for the following reasons. Plaintiff's back injury was corroborated by co-worker Dwayne Alexander; her telling Tina Droge that her back was hurting was corroborated by Tina (her failure to say it was an accident and Tina's failure to report it as an accident were not determinative (very few lawyers and even fewer workers are aware of the distinction between "accident" and "specific traumatic incident"; the description is not controlling; the facts constituting the legal conclusion are
determinative); the emergency room report showed that plaintiff told medical personnel that she hurt her back at work; her back problems had not kept her out of work until the specific traumatic incident of December 2; her treating physician found (and the Commission finds as a fact) that this incident aggravated a previous condition; the leaf raking incident caused a flare-up; plaintiff's being on the safety committee does not logically lead to the conclusion that she knew how to report anaccident when few people equate a specific traumatic incident to an accident (the terms are just not equivalent in laymen's parlance); minor variations in the way an incident is described is normal, what is important is that the record, taken as a whole, clearly and cogently corroborates Plaintiff's testimony.
29. The Commission is the finder of fact. It may choose not to believe the evidence after considering it, but it may not wholly disregard or ignore competent evidence. Weaver v. AmericanNational Can Corp., 123 N.C. App. 507, 473 S.E.2d 10 (1996). "In making its findings of fact, the Commission may not ignore, discount, disregard or fail to properly weigh and evaluate any of the competent evidence before it." Ward v. BeaunitCorp., 56 N.C. App. 128, 134, 287 S.E.2d 464 (1982), citingHarrell v. Stevens Co., 45 N.C. App. 197,262 S.E.2d 830 (1980). The Deputy Commissioner erred in this regard.
In her findings Deputy Commissioner Chapman pointed to the inconsistent stories allegedly told by Plaintiff about her injury, the absence of a report of injury in Dr. Miller's January note, the leaf raking, and the gynecologist's report. She failed to address important evidence in the case:
the corroborating testimony of two co-workers;
 the fact that on December 11, 1995 Plaintiff submitted a disability application which clearly identified a work-related accident occurring December 2, 1995;
 the fact that on February 15, 1996 Plaintiff again submitted a disability application listing a work cause for the injury;
 the fact that although the gynecologist noted there was no radiating pain that there was still a diagnosis of musculoskeletal pain for which Naprosyn was prescribed;
 the questionnaire in Dr. Miller's file which clearly and unmistakably has her telling the doctor that the December 2 incident was the onset of the recurrent pain she saw him for;
 the admission by the supervisor Droge that after the incident she assigned Plaintiff lighter work; and
 the fact that despite being operated upon in August and being seen for a variety of other complaints between March 1995 and December 1995 Plaintiff made no mention in the records of those visits and that operation of any problem with recurrent back pain.
All these facts point convincingly to what Dr. Miller testified likely happened, that she was doing well until December 2, 1995 when she had a specific traumatic incident which touched off this new pain condition. Yes, Plaintiff had improvement and was able to rake some leaves, but nowhere in the evidence did she return to her baseline condition before December 2. Plaintiff suffered an injury to her back, covered under the statute. Deputy Commissioner Chapman impermissibly disregarded critical evidence and erred in denying compensation.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury through a specific traumatic incident of the work assigned on December 2, 1995. N.C. Gen. Stat. § 97-2(6).
2. There are two theories upon which a back injury can be compensated: (1) if the claimant was injured by accident; or (2) if the injury arose from a specific traumatic incident. Fishvs. Steelcase, Inc., 116 N.C. App. 703, 449 S.E.2d 233
(1994), cert. denied, 339 N.C. 737, 454 S.E.2d 650 (1995);Glynn v. Pepcom Industries, 122 N.C. App. 348,469 S.E.2d 588 (1996). The 1983 amendment, which added the second theory, was enacted by the Legislature with the intent to relax the often-stringent requirement of the definition of accident.Bradley v. E.B. Sportswear, Inc., 77 N.C. App. 450,335 S.E.2d 52 (1985). In Richards v. Town of Valdese,92 N.C. App. 222, 374 S.E.2d 116 (1988), disc. reviewdenied, 324 N.C. 337, 378 S.E.2d 799 (1989), the Court stated that the General Assembly recognized the complex nature of back injuries, and did not intend to limit the definition of specific traumatic incident to an instantaneous occurrence. Back injuries that occur gradually, over long periods of time, are not specific traumatic incidents; however, we believe that events which occur contemporaneously, during a cognizable time period, and which cause a back injury, do fit the definition intended by the legislature. Id. at 225, 374 S.E.2d at 118-19.
3. Here Plaintiff has adequately proven that she had a specific traumatic incident, which caused her back pain. Although she had been seen for back pain in early 1995, this had resolved and she had not returned after March to the doctor. She had been seen repeatedly by her family physician and the Women's Clinic and had even been operated on for pelvic adhesive disease, all without any mention of chronic back pain. She was able to identify a specific moment in time when she had the onset of pain, at a time when her back was stretched out to the fullest. Her co-worker Alexander testified under subpoena and corroborated her version of the incident. Another co-worker testified that she had an unusual complaint of pain that evening as she was leaving. Her supervisor Tina remembered her saying she had hurt her back and remembered that after that Plaintiff had needed extra help she had not needed before. The emergency room note of the next day indicates injury at work. Dr. Miller's notes do not reflect a specific incident, although the questionnaire plaintiff filled out when she went to see him refers clearly to the December 2 incident.
4. Evidence that a work-related injury aggravated or accelerated a pre-existing condition or disease is sufficient to support a compensation award. Jackson vs. L. G. DewittTrucking Co., 82 N.C. App. 208, 346 S.E.2d 160 (1986).
5. The believable and credible evidence is that Plaintiff did have degenerative disc disease but that it was not symptomatic, that she suffered a specific traumatic incident on or about December 2, 1995, and that she therefore has suffered an injury compensable under the Act. Like the worker in Richards,supra, she was not doing anything that necessarily would create greater risk of injuring her back; however, this is not an occupational disease case, and is fact the very sort of case the General Assembly must have had in mind when it changed the law to allow compensation for specific traumatic incidents as opposed to accidents. Therefore Plaintiff has satisfied her burden of proof.
6. Plaintiff is entitled to temporary total compensation of $231.85 per week from December 2, 1995, until she returns to work at her pre-injury wage or until further order of the Commission. Defendants are entitled to a credit for any wages earned after December 2, 1995.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay Plaintiff temporary total compensation of $231.85 per week from December 2, 1995, until she returns to work at her pre-injury wage or until further order of the Commission. Defendants are entitled to a credit for any wages paid after December 2, 1995. Subject to attorney's fees hereafter awarded, Defendants shall pay the amount accrued to date in one lump sum, with interest at 8% per annum from January 14, 1997, until paid, and thereafter shall pay $231.85 weekly with every fourth check going directly to Plaintiff's attorney. One-fourth of the lump sum amount shall be paid directly to Plaintiff's attorney. Interest on the attorney fee portion of the lump sum shall go to Plaintiff.
2. Plaintiff is entitled to medical compensation resulting from her compensable injury, including payment for the Emergency Room visits involving her back following December 2, 1995, and for Dr. Miller's treatment and surgery, and Defendants shall pay for same. Plaintiff is also entitled to vocational services necessary to return her to work if she is later found capable of returning, and Defendants shall pay for it.
3. Defendants shall pay the costs.
This 8th day of April, 1998.
 S/ ____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _________________ CHRISTOPHER L. SCOTT COMMISSIONER
DISSENTING WITHOUT A WRITTEN OPINION:
S/ ______________ DIANNE C. SELLERS COMMISSIONER